# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

HARRY THOMAS WILLIAMS,

    Movant,

    v.

UNITED STATES OF AMERICA,

    Respondent.

CIVIL ACTION NO.: 5:16-cv-49

(Case No.: 5:14-cr-14)

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On June 25, 2015, this Court sentenced Harry Thomas Williams ("Williams") to fifteen years' imprisonment under the Armed Career Criminal Act ("ACCA") after he pleaded guilty to being a felon in possession of a firearm, as well as to one count of possession of methamphetamine with intent to distribute. Williams, who is currently incarcerated at the Federal Correctional Institution in Jesup, Georgia, has now filed a Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255. (Doc. 52.)[1] Williams contends that the Court must resentence him following the United States Supreme Court's decision in Johnson v. United States, ___ U.S. ___, 135 S. Ct. 2551 (June 26, 2015). However, Johnson only invalidated the ACCA's residual clause, and Williams has failed to demonstrate that the Court relied upon that clause in any way during in his sentencing proceedings. To the contrary, the record reveals that the Court properly sentenced Williams as an armed career criminal under other provisions of the ACCA due to his prior convictions for sale and distribution of cocaine,

---

[1] The pertinent record documents in this case are filed on the docket of Williams' criminal case, United States v. Williams, 5:14-cr-14 (S.D. Ga. Dec. 8, 2010), and many are not included in Williams' civil docket. Thus, for ease of reference and consistency, the Court cites to Williams' criminal docket in this Order and Report and Recommendation.

possession of cocaine with intent to distribute, and burglary. Williams also claims that his trial counsel rendered ineffective assistance of counsel by failing to object to his designation as an armed career criminal and failure to investigate an insanity defense. However, Williams has failed to show that his counsel's performance fell below the objective standard of reasonableness, and he has failed to show that he suffered prejudice from his counsel's alleged deficiencies.

For these reasons, which I detail more fully below, Williams' claims lack merit. Therefore, I **RECOMMEND** the Court **DENY** Williams' Motion to Vacate, Set Aside, or Correct his Sentence. (Doc. 52.) Further, I **RECOMMEND** that the Court **DENY** Williams a Certificate of Appealability and *in forma pauperis* status on appeal. The Court should **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal. The Court **GRANTS** Williams' Leave to Amend his Reply, (doc. 62), and the Court has considered the assertions in that pleading when ruling on this matter.

## BACKGROUND

### I. The Armed Career Criminal Act

The Court typically begins its discussion of a matter by detailing the factual and procedural background of the case before it. However, the facts and history of Williams' case will be better understood by first discussing the federal statutes under which Williams was prosecuted and recent cases pertinent to those laws.

Federal law prohibits certain persons, including convicted felons, from shipping, possessing, or receiving firearms in or affecting interstate commerce. 18 U.S.C. § 922(g)(1). Ordinarily, an individual who violates this prohibition faces a statutory maximum sentence of ten years' imprisonment. 18 U.S.C. § 924(a). However, a statutory provision known as the "Armed

Career Criminal Act" or "ACCA" imposes a higher mandatory minimum term of imprisonment for certain offenders. Any person who violates Section 922(g) and has on three or more occasions been convicted for a "serious drug offense" or "violent felony" will receive a mandatory minimum sentence of fifteen years' imprisonment. 18 U.S.C. § 924(e)(1). The ACCA provides, in relevant part:

> the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—
>
> > (i)      has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> >
> > (ii)     is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).[2]

The first prong of this definition, set forth in subsection (i), has come to be known as the "elements clause," while the crimes listed at the beginning of the subsection (ii), "burglary, arson, or extortion, or involves use of explosives," have come to be known as the "enumerated crimes." United States v. Owens, 672 F.3d 966, 968 (11th Cir. 2012). Finally, the last portion of subsection (ii), "or otherwise involves conduct that presents a serious potential risk of physical injury to another," is commonly referred to as the "residual clause." Id.

In the landmark case of Johnson, ___ U.S. at ___, 135 S. Ct. at 2563, the Supreme Court held that "imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process[.]" Thus, the Court struck down that portion of the ACCA. However, the Court also emphasized that its "decision does not

---

[2] "Serious drug offense" means "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law[.]" 18 U.S.C. § 924(e)(2)(A)(ii).

call into question application of the Act to the four enumerated offenses, or the remainder of the Act's definition of a violent felony." Id. In Welch v. United States, ___ U.S. ___, 136 S. Ct. 1257, 1264–65 (Apr. 18, 2016), the Supreme Court held that Johnson announced a new substantive rule that applies retroactively to cases on collateral review.

While the four enumerated crimes (or the "enumerated crimes clause") have not suffered the same fate as the residual clause, they have been the subject of numerous recent decisions of the Supreme Court and the Eleventh Circuit Court of Appeals. These decisions inform an analysis that is more complicated than would appear at first blush: whether an offender's prior conviction that bears the label of an enumerated crime actually constitutes a conviction for one of the enumerated offenses for purposes of the ACCA. Rather than merely relying on the label attached to an offender's prior conviction, federal courts must assess whether the defendant committed one of the enumerated crimes actually envisioned upon the passage of the ACCA. To conduct this inquiry, a sentencing court must assess the elements forming the basis of the offender's conviction and compare those elements to the "generic crime–*i.e.,* the offense as commonly understood." Descamps v. United States, 570 U.S. 254, 257 (2013).

Decisions regarding whether a burglary conviction qualifies as an ACCA predicate offense demonstrate how courts approach the enumerated crimes. Though the ACCA specifically lists "burglary" as a violent felony, merely because a state conviction is labeled a "burglary" does not automatically qualify it as a predicate offense under the ACCA. Rather, "[a]s the [ACCA] has been interpreted, a conviction for 'generic burglary' counts as a violent felony, while a conviction for 'non-generic burglary' does not." United States v. Ranier, 616 F.3d 1212, 1213 (11th Cir. 2010), *abrogated on other grounds by* United States v. Howard, 742 F.3d 1334 (11th Cir. 2014). A "generic" burglary is "any crime, regardless of its exact definition

or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Taylor v. United States, 495 U.S. 575, 599 (1990). A "non-generic" burglary is one that "do[es] not include all of the elements essential to generic burglaries," including burglaries of boats, automobiles, and other non-buildings. Ranier, 616 F.3d at 1214.

As with all enumerated crimes, to assess whether a state conviction for burglary qualifies as a generic crime, the Court can employ two methods. First, the Court must assess the state statute under "the categorical approach." Howard, 742 F.3d at 1345–46. If that assessment does not end the inquiry, then the Court must determine whether the statute can be assessed under the "modified categorical approach." Id. Under the "categorical approach," courts "compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime–i.e., the offense as commonly understood." Descamps, 570 U.S. at 257. Under this approach, "[t]he prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than, those of the generic offense." Id. If the statute so qualifies, then this ends the inquiry: the conviction is a violent felony, and the modified categorical approach is not needed. Howard, 742 F.3d at 1345.

However, if the burglary statute is broader than the elements of the generic crime, the statute itself does not qualify as a predicate offense under the categorical approach. Thus, the court must then determine whether it can apply the "modified categorical approach" to assess whether the defendant's conviction under the statute does qualify as a predicate offense. Id. Courts can use the modified categorical approach in those instances "when a prior conviction is for violating a so-called divisible statute." Descamps, 570 U.S. at 257. A divisible statute is a statute which "sets out one or more elements of the offense in the alternative—for example,

stating that burglary involves entry into a building or an automobile. If one alternative (say, a building) matches an element in the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to . . . determine which alternative formed the basis of the defendant's prior conviction." Id.

To determine which alternative of a divisible statute formed the basis for the prior conviction, a court can assess a limited class of documents including the charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge. Shephard v. United States, 544 U.S. 13, 16 (2005). These documents are commonly referred to as "Shephard documents." If a statute is divisible, the Court can use the Shephard documents to "do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime." Descamps, 570 U.S. at 257. If the Shephard documents show that the defendant was found guilty under elements of a divisible statute which match elements of the generic offense instead of those which do not, the prior conviction is an ACCA predicate. Howard, 742 F.3d at 1347. In contrast, "a statute is indivisible if it contains 'a single, indivisible set of elements.'" Id. at 1346 (quoting Descamps, 570 U.S. at 258 & at 257 (defining an indivisible statute as one "'not containing alternative elements'"). "If a statute is indivisible, a court may not apply the modified categorical approach, and that is the end of the inquiry; the prior conviction cannot qualify as an ACCA predicate regardless of what any Shephard documents may show." Id.

In Howard, the Eleventh Circuit assessed whether the defendant's conviction under Alabama's third-degree burglary statute qualified as a generic burglary, and thus, a predicate violent felony under the ACCA. The Eleventh Circuit noted "[t]he elements of generic burglary under the ACCA are: (1) 'an unlawful or unprivileged entry into, or remaining in,' (2) 'a

building or other structure,' (3) 'with intent to commit a crime.'" Id. at 1348 (quoting Taylor,
495 U.S. at 598). The Eleventh Circuit first determined that the Alabama statute that the
defendant in Howard was convicted under did not qualify as a generic burglary under the
categorical approach because the elements of the offense were not the same as, or narrower than,
those of the generic offense. Id. (citing Ranier, 616 F.3d at 1215). The Howard court then
assessed whether the statute was divisible, and therefore, was able to be assessed under the
modified categorical approach. The Court noted that, under Descamps, the "key to determining
divisibility . . . is whether the statute sets out one or more elements of the offense in the
alternative—for example, stating that burglary involves entry into a building *or* an automobile."
Id. (internal citation omitted) (emphasis in original). The Alabama statute contains nothing
"suggest[ing] its definition of 'building' is drafted in the alternative." Id. "The items that follow
each use of the word 'includes' in the statute are non-exhaustive examples of items that qualify
as a 'structure' and thus count as a 'building' under . . . § 13A-7-l(2). . . . The statutory definition
of 'building' does not say what is not included. In light of the Descamps decision, illustrative
examples are not alternative elements." Id. (internal citations omitted). Thus, the Eleventh
Circuit determined that Alabama's third-degree burglary statute, § 13A-7-7, is a non-generic and
indivisible statute, and a conviction under that statute "cannot qualify as a generic burglary under
the ACCA." Id. at 1349.

In Mathis v. United States, ___ U.S. ___, 136 S. Ct. 2243 (June 23, 2016), the Supreme
Court further clarified how courts should employ the modified categorical approach. The Court
held that the fact that a statute contains multiple alternative means of committing the crime does
not make the statute divisible, if these means are not alternative elements but rather only factual
determinations about an element, and thus, unnecessary to the jury's determination of guilt for

the crime. <u>Mathis</u>, ___ U.S. at ___, 136 S. Ct. at 2251–54. Put another way, the Court held that, when using the modified categorical approach to determine whether a prior conviction is a "violent felony" or "serious drug offense" under the ACCA, a court should focus on the "elements" of the statutory offense rather than on that offense's non-essential "means" of commission. <u>Id.</u>

After <u>Mathis</u>, the Eleventh Circuit analyzed whether a conviction under Georgia's former burglary statute can constitute a predicate violent felony under the ACCA. <u>United States v. Gundy</u>, 842 F.3d 1156, 1166–69 (11th Cir. 2016). In <u>Gundy</u>, the offender had been designated as an armed career criminal due to his prior burglary convictions under the same Georgia burglary statute underlying Williams' Georgia burglary convictions. <u>Id.</u> Applying <u>Mathis</u>, the Eleventh Circuit determined that, though the statute was "non-generic,"—i.e., broader than generic burglary, it was divisible. <u>Id.</u> The Court reasoned "the plain text of the Georgia statute has three subsets of different locational elements, stated in the alternative and in the disjunctive . . . effectively creating several different crimes." <u>Id.</u> at 1167. "That the Georgia prosecutor must select and identify the locational element of the place burgled—whether the place burgled was a dwelling, building, railroad car, vehicle, or watercraft—is the hallmark of a divisible statute." <u>Id.</u> Therefore, courts may continue to apply the modified categorical approach to determine whether a defendant's convictions under Georgia's prior burglary statute match the generic definition of burglary, and thus, qualify as predicate offenses under the ACCA. <u>Id.</u> at 1168–69.

## II. Williams' Conviction and Sentencing

On December 8, 2010, a grand jury in this District charged Williams with four counts: possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count One);

possession of a prohibited weapon, in violation of 26 U.S.C. § 5861 (Count Two); possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a) (Count Three); and possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count Four). (Doc. 1.) The Government's Penalty Certification filed at the commencement of the case stated that Williams faced a minimum term of imprisonment of fifteen years under the ACCA if he had three prior convictions for serious drug offenses or violent felonies. (Doc. 2.)

Williams and his retained attorney, Mr. Joseph East, were able to negotiate a plea agreement with the Government whereby Williams agreed to plead guilty to Count One (possession of a firearm by a convicted felon) and Count 3 (possession with intent to distribute methamphetamine) in exchange for the Government moving to dismiss the remaining counts. (Doc. 46.)

On January 13, 2015, Williams appeared before the Honorable Lisa Godbey Wood for a change of plea, or Rule 11, proceeding. (Doc. 45.) At the commencement of the hearing, Judge Wood explained that the parties had previously appeared for a Rule 11 hearing on December 19, 2014, but that Williams expressed surprise at the range of penalties he could face. (Doc. 56, pp. 2–3.) Thus, at that time, the Court found that Williams could not enter a knowing and voluntary guilty plea and set the case for trial. (Id.) However, Williams moved to continue that trial, and his counsel, Mr. East, subsequently notified the Court that Williams "is now fully apprised and understands the range of possible penalties he may face and does desire to enter into a plea of guilty to Counts 1 and 3 of this indictment." (Id. at p. 3.) Judge Wood asked Williams if this was correct, and he responded that it was. (Id.) Mr. East explained that he had met with Williams on multiple occasions since the last Rule 11 hearing and that Mr. East had "done everything necessary to appraise him of everything he needs to know prior to today." (Id.)

Judge Wood then engaged in an extensive plea colloquy with Williams. She explained to Williams that the decision to plead guilty was an important one, that the decision was entirely his decision, and that she wanted to be certain that Williams understood all of the important considerations that go into the decision. (Id. at pp. 3–4.) Judge Wood inquired whether anyone had forced Williams to offer to plead guilty, and he said no one had done so and that pleading guilty was what he wanted to do. (Id. at p. 4.)

Judge Wood had Williams placed under oath before asking him a series of questions. (Id.) He was able to recount his personal information, including his age, the age of his children, and his residence. (Id. at p. 5.) Williams testified that he completed high school and held a number of jobs. (Id.) Williams then stated that he had the disabilities of bipolar disorder and paranoid schizophrenia. (Id.) Judge Wood asked Williams whether he was currently taking medication for those conditions, and he responded that he was. (Id. at pp. 5–6.) He also affirmed that his medications adequately addressed his conditions. (Id. at p. 6.) Judge Wood then asked Mr. East whether he had any difficulty in conversing with Williams. (Id.) Mr. East responded that he had not, that Williams had been very alert, that Williams had not exhibited any kind of erratic behavior during their conversations, that no court in Williams' extensive criminal history had ever declared him incompetent to stand trial, and that East did "not know of any reason other than having a mental condition whereby he would be unable to— to where he would be able to meet the criteria of some type of psychological defense." (Id.) Williams then affirmed that he had not experienced any problem talking with his attorney. (Id.) When asked by Judge Wood to describe in his own words why the last proceeding was cut short, Williams responded, "Because I wasn't understanding [sic] the 15-year minimum." (Id. at pp. 6–7.) He then stated that he understood it better after talking with Mr. East. (Id. at p. 7.)

Judge Wood explained to Williams that he was presumed innocent and the Indictment was not evidence of his guilt. She also explained that he did not have to plead guilty, and if he chose to persist in his not guilty plea, he would have the right to: a public and speedy trial by jury; a presumption of innocence during that trial; the assistance of trial counsel; see, hear, confront, and cross-examine the Government's witnesses and evidence; call witnesses on his behalf; and testify himself or remain silent. (<u>Id.</u> at pp. 8–9.) Judge Wood cautioned Williams he would be waiving these rights if he pleaded guilty. (<u>Id.</u>) She explained that, if she accepted his guilty plea, there would be no right to trial of any kind, and that what would remain of his case would be the sentencing phase. (<u>Id.</u> at p. 9.)

Williams stated he understood. (<u>Id.</u>) Williams also stated he and Mr. East reviewed the Indictment together, that he had the opportunity to talk to Mr. East about the facts of his case and the underlying conduct, as well as about the proposed plea agreement, and that Mr. East had discussed the law pertaining to his case. (<u>Id.</u> at pp. 9–10.) Williams specifically testified that he and Mr. East had multiple conversations about the possible penalties in his case. (<u>Id.</u> at p. 10.) Williams stated that he was satisfied with Mr. East's services and that he had no complaints about Mr. East whatsoever. (<u>Id.</u> at p. 11.)

Judge Wood reviewed the applicable counts of the Indictment with Williams and discussed the essential elements of the crimes for which he was charged and what the Government would have to prove if he went to trial. (<u>Id.</u> at pp. 11–13.) Williams responded that he understood these elements and what the Government would have to prove if he went to trial. (<u>Id.</u>) Judge Wood advised Williams of the penalties she could impose on the Counts to which he was pleading guilty. (<u>Id.</u> at pp. 13–14.) Pertinently, she stated, "Mr. Williams, Count 1 carries what is called a mandatory minimum, and that means that if I accept your plea as to Count 1, I

must sentence you to at least 15 years in prison as to Count 1. Do you understand that?" (Id. at p. 13.) Williams responded that he understood. (Id.) Moreover, Judge Wood explained to Williams that, in imposing a sentence upon him, she would have to take into consideration the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553. (Id. at pp. 14–15.) Williams stated that no one had promised him an exact sentence, and Judge Wood explained that anyone's estimation of what his sentence might be would in no way bind the Court. (Id. at p. 15.)

Judge Wood affirmed with Williams that he had given Mr. East permission to negotiate a plea agreement with the Government. (Id. at pp. 15–16.) She then asked the Assistant United States Attorney ("AUSA") to summarize the provisions of the plea agreement. AUSA Shane Mayes stated:

> Your Honor, in summary, the plea agreement provides that the Defendant will plead guilty to Counts 1 and 3of the indictment. The Government will not object to a recommendation by the US Probation Office that Mr. Williams receive a three-level reduction in the offense level for acceptance of responsibility pursuant to the sentencing guidelines.
>
> The Government and the Defendant agree to recommend to the probation officer and the Court at sentencing that, for the purpose of the guidelines, the offense involved methamphetamine having a net weight of 9.91 grams.
>
> The Defendant agrees to pay restitution for the full loss caused by his criminal conduct. At sentencing, the Government will move to dismiss any other counts of the indictment that remain pending against Mr. Williams.
>
> Your Honor, the plea agreement provides the Government's standard direct appeal waiver and collateral attack waiver. Mr. Williams additionally waives all rights to request information under the Freedom of Information Act. Mr. Williams waives protections of Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence.

(Id. at pp. 16–17.) Judge Wood asked Williams if AUSA Mayes' summarization of the plea agreement was consistent with the plea agreement he signed, and he stated it was. (Id. at p. 17.)

Williams also stated he read the plea agreement, and Mr. East answered any questions he may have had before he signed the agreement. (Id.) Williams reaffirmed that no one had made him any promises regarding the outcome of his case, other than the provisions contained in the plea agreement. (Id.)

Judge Wood then specifically addressed the direct appeal waiver with Williams, stating the following:

> I do want to pick back up on something that Mr. Mayes alluded to and that is, that this plea agreement that you're urging does contain waivers of certain appeal rights.
>
> It states "Defendant entirely waives his right to a direct appeal of his conviction and sentence on any ground." However, there are three exceptions to that waiver. That is, if one of these three things were to occur, then you do get a direct appeal right. Number 1, if I were to sentence you above the statutory maximum, then you could appeal that directly; or, Number 2, if I were to sentence you above the advisory guideline range as found by me, then you could appeal that directly. Or Number 3, if the Government were to file an appeal, you could appeal that directly. Do you understand?

(Id. at pp. 17–18.) Williams stated he understood the appeal waiver provision and that he had no questions regarding it. (Id. at p. 18.)

Judge Wood also explained that the proposed plea agreement contained a waiver of certain of Williams' collateral attack rights. She explained:

> It states "Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by any method including but not limited to a 28 USC Section 2255 motion."
>
> Now, that waiver does contain one exception. The exception is that you may collaterally attack your conviction and sentence based on a claim of ineffective assistance of counsel.

(Id.) When asked if he understood the collateral attack waiver provision, Williams replied that he did and that he had no questions whatsoever about it. (Id. at pp. 18–19.)

Judge Wood asked Mr. East and AUSA Mayes whether they were aware of any impropriety on the part of the Government in handling Williams' case, and they both responded no. (Id. at p. 19.) Judge Wood then asked Williams whether he wished to still plead guilty to Counts One and Three of the Indictment because he was in fact guilty of those Counts, and he answered in the affirmative. (Id.) Judge Wood also asked Williams whether he understood the rights and privileges he was waiving if she accepted his plea, and he said he did. (Id.) Judge Wood determined that Williams' decision to plead guilty was "knowing" and "voluntary." (Id. at pp. 19–21.) Specifically, Judge Wood stated:

> [Williams] has been diagnosed with bipolar disorder and schizophrenia, and because of that, **I have paid particular attention to Mr. Williams as he's interacted with the Court today and on December 19th** when he appeared before me last. According to him, he does take medication that addresses those issues and he is current on his medication. Nonetheless, **I've carefully analyzed his behavior during court today and prior to.**
>
> I find specifically that he has an understanding of the case that's presently pending against him. He understands the essential elements that the Government would have to prove in order for him to be found guilty by a jury.
>
> He understands the consequences of his plea and the possible sentence that he faces as a result of his plea. He understands the rights that he waives or gives up by entering a plea of guilty. He has had the services of a competent defense attorney who has gone over all the requisite documentation with him, the facts, the law, the indictment, the plea agreement.
>
> **I've watched Mr. Williams as he's responded to my questions, and I find that he is in possession of all of his faculties and has participated intelligently both today and back in December at the first hearing.**
>
> He pulled up at the first hearing for an understandable reason, and that is, upon hearing the significant penalties that he faces if he were to plead guilty, he took time to speak at length with his attorney on multiple occasions as has been presented today to get confirmation that that is, in fact, what the possible penalty range would be.
>
> It is entirely understandable that he would focus on that issue to the extent that he has. **Nothing in court today or back in December gives me pause that he is in any way laboring under any mental disability or defect that interferes with**

**his ability to converse with his attorney and plan and strategize his own defense, nor do I have any indication that any condition he has has interfered with his appreciation of what we're doing here today, what the case is about, the consequences of his plea and the other important decisions that go into deciding whether to enter a plea of guilty or not guilty**.

All of that is to say that it is The Court's decision that he is offering to enter this plea knowingly and intelligently and voluntarily; is that correct, Mr. Williams?

(Id. (emphases supplied).)  Williams responded in agreement with Judge Wood's conclusions.

(Id. at p. 21.)  Mr. East then added that had known Williams since 1999 and had represented him on numerous occasions.  (Id.)

Sergeant Michael Ray, a deputy sheriff with the Ware County Sherriff's Office, provided the Government's factual basis for the plea.  (Id. at pp. 22–24.)  Sergeant Ray testified that he participated in a month-long investigation of the distribution of methamphetamine occurring at Williams' residence.  (Id.)  That investigation culminated in a search of the residence, pursuant to a warrant, on November 19, 2013.  (Id. at pp. 22–23.)  Officers located Williams lying on the bed in the master bedroom of the residence with a .9-millimeter pistol laying on one side of him and a sawed off shotgun laying on the other.  (Id. at p. 23.)  Williams' possession of these firearms formed the basis of Count One of the Indictment.  (Id.)  Officers also found a quantity of methamphetamine, digital scales, and green zip lock bags in the master bedroom.  (Id.)  Ray further testified that after the search, Williams admitted to possessing the two firearms and to being a distributor of methamphetamine.  (Id.)  Ray confirmed that the firearms Williams possessed had been shipped in interstate commerce and that Williams had been convicted of at least one felony prior to the search of his home.  (Id. at p. 24.)  Mr. East had no questions for Sergeant Ray on cross-examination.  (Id.)

Upon questioning from Judge Wood, Williams did not dispute any of the testimony given by Sergeant Ray, and he admitted to the truth of Ray's testimony.  (Id. at pp. 24–25.)  Judge

Wood found that there was a factual basis for the plea of guilty, accepted Williams's plea, and adjudged him guilty of Counts One and Three of the Indictment. (Id. at p. 25.) Judge Wood advised Williams that the Probation Office would prepare a Pre-Sentence Investigation report ("PSI"), and the Court would schedule a sentencing hearing after the PSI was disclosed to the Government and the defense. (Id.)

Prior to Williams' sentencing hearing, United States Probation Officer Scot Riggs prepared a PSI. Probation Officer Riggs detailed Williams' offense conduct and criminal history and calculated Williams' statutory penalties, as well as his advisory Guidelines' range. The Probation Officer detailed an extensive list of adult criminal convictions. (PSI, ¶¶ 38–58.) Pertinently, Probation Officer Riggs detailed a 1998 conviction for sale of cocaine, (id. at ¶ 40); a 1998 conviction for and possession with intent to distribute cocaine, (id.); and a 1999 conviction for burglary of a dwelling and related battery, (id. at ¶ 42). When calculating Williams' offense level, Probation Officer Riggs asserted, "[T]he defendant has at least three prior convictions for a violent felony or serious drug offense, or both, which were committed on different occasions (see paragraphs 40 and 42). Therefore, the defendant is an armed career criminal and subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e)." (Id. at ¶ 32.) Officer Riggs concluded that Williams' statutory minimum term of imprisonment was fifteen years and the maximum term was life. (Id. at ¶ 85.) According to the PSI, Williams' Guidelines' range for imprisonment was 188 to 235 months. (Id. at ¶ 53.) Williams' counsel filed objections to the original draft of the PSI, which were resolved by incorporating the defendant's position into the body of the final report. (Addendum to PSI.)

Williams appeared before Judge Wood for a sentencing hearing on June 22, 2015. (Doc. 48.) At that hearing, Judge Wood heard from Williams, Williams' counsel, and counsel

for the Government regarding Williams' potential sentence.  (Doc. 57.)  This colloquy began by Judge Wood asking Williams if he had an opportunity to read the PSI and discuss it with Mr. East.  (Id. at pp. 2–3.)  Mr. Williams responded that he had.  (Id. at p. 3.)  Mr. East then confirmed that there were no remaining objections to either the factual accuracy of the PSI or the Probation Officer's application of the Guidelines.  (Id. ("They agreed with me on all my objections.  They gave me everything I wanted.").)  There being no objections from the Government or Williams, Judge Wood adopted the PSI's findings of fact and conclusions regarding the advisory Guidelines' range.  (Id.)  Judge Wood determined that Count One carried a statutory minimum punishment of fifteen years' imprisonment and a maximum of life in prison, whereas the Guidelines called for a sentence between 188 to 235 months in prison.  (Id.)

Williams then testified before the Court.  (Id. at p. 4.)  He stated that he understood that there was a mandatory minimum in the case of fifteen years (180 months) and that the lower end of his Guidelines' range was 188 months.  (Id. at p. 5.)  Williams asked that the Court sentence him to fifteen years and that the Court order him to get treatment for his drug habit.  (Id.)  He explained that he had been selling drugs to support his drug habit and that he possessed the firearms for protection from burglars, as there had been a number of burglaries in his area.  (Id. at p. 4.)  Williams testified that he had progressed to the twelfth grade in school and that he wanted to be incarcerated close to home so he could see his parents.  (Id. at pp. 5–6.)  Williams then stated:

> I'd just like to apologize to The Court and want to let them know I was not trying to hurt anybody.  I was at a bad point where I was out of control and I had a lot of things going on, and, Judge, my thinking and character, and I was at a low point in my life, and I'm asking this Court to have leniency on me and be here with me and bear with me and help me better myself while I'm doing this time where I get into some drug programs and get in school and come back out on a productive track and not back out on the track that I was on, ma'am.

(Id. at p. 6.)

Judge Wood then pronounced a sentence of 180 months. (Id. at pp. 7–8.) Judge Wood explained that she varied downward from the advisory Guidelines' range (from 188 months to 180 months) "because 15 years in federal prison is sufficient but not greater to address the seriousness of the conduct that is involved, given Mr. Williams' personal history and criminal record." (Id. at p. 8.) In her articulation of how she arrived at her sentence, Judge Wood stated, "[T]he investigation revealed that the Defendant was selling quantities of methamphetamine. He had two loaded firearms. He has an extensive criminal history including convictions for four separate felony offenses. Nevertheless, as I said earlier, 15 years is sufficient. That is a serious sentence, and that will do." (Id.) Judge Wood advised Williams that he waived his right to appeal with limited exceptions, pursuant to his plea agreement. (Id. at p. 9.) The Court entered judgment of 180 months' imprisonment as to each count, to be served concurrently, on June 26, 2015. (Doc. 49.)

## III.    Williams' Section 2255 Motion

Williams filed the instant Section 2255 Motion on the first anniversary of his sentencing hearing, June 22, 2016. (Doc. 52, pp. 12–13.) Williams raises three arguments in support of his Motion: (1) that he "does not have the necessary predicate convictions to be classified as an Armed Career Criminal, specifically, [Williams'] Georgia Burglary conviction falls within the unconstitutional residual clause. In addition, Movant's conviction for Sale of Cocaine is not a serious drug offense[;]" (2) that Mr. East failed to investigate whether Williams' prior convictions were proper predicate offenses that could be used to classify Williams as an armed career criminal under the ACCA; and (3) that East failed to investigate his reduced mental

capacity for purposes of asserting an insanity defense.  (<u>Id.</u> at pp. 4–9; Doc. 53.)[3]  The

Government filed a Response to Williams' Motion, (doc. 60), and Williams filed a Reply,

(doc. 61), as well as a Motion to Amend, (doc. 62), seeking to correct typographical errors in his

Reply.

## DISCUSSION

**I.     Whether Williams Procedurally Defaulted his Challenge to his ACCA Designation**

As an initial matter, while Williams now seeks to directly attack his sentence (in addition

to challenging his counsel's performance), he has waived that attack because he did not

challenge his sentence on appeal.  Indeed, he did not file any appeal in this case.  In the Eleventh

Circuit, under the procedural default rule, "a defendant generally must advance an available

challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred

from presenting that claim in a § 2255 proceeding."  <u>McKay v. United States</u>, 657 F.3d 1190,

1196 (11th Cir. 2011) (internal citation and punctuation omitted).  The procedural default rule

"'is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the

courts to conserve judicial resources and to respect the law's important interest in the finality of

judgments.'"  <u>Id.</u> (quoting <u>Massaro v. United States</u>, 538 U.S. 500, 504 (2003)).

A showing of "cause and prejudice" can overcome a defendant's default.  <u>Id.</u>[4]  More

specifically, a defendant can overcome "application of the procedural default bar by show[ing]

---

[3]   Williams originally contended that Mr. East failed to move for a downward departure based on Williams' "significantly reduced mental capacity."  However, after reading the Government's opposition, Williams concedes that he cannot show prejudice from this alleged error because Judge Wood sentenced him to the statutory minimum.  (Doc. 61, p. 7 (citing <u>United States v. Reynolds</u>, 215 F.3d 1210 (11th Cir. 2000)).)  Thus, the Court need not further assess this claim, as it has been withdrawn.  Even if Williams had not withdrawn the claim, it is due to be denied for the reasons stated in the Government's Response.

[4]   "Under the actual innocence exception—as interpreted by current Supreme Court doctrine—a movant's procedural default is excused if he can show that he is actually innocent either of the crime of conviction or, in the capital sentencing context, of the sentence itself."  <u>McKay</u>, 657 F.3d at 1196 (citing <u>Dretke v.</u>

cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error." Id. (citing Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir.2004) (alteration in original)). To show cause for procedural default, a defendant must show that "some objective factor external to the defense prevented [him] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [defendant's] own conduct." Lynn, 365 F.3d at 1235.

Williams argues that the Court should excuse his procedural fault due to Mr. East's allegedly ineffective assistance. (Doc. 53, p. 4.)[5] To be certain, a meritorious claim of ineffective assistance of counsel can constitute cause to excuse a procedural default. United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000). However, a defendant does not clear the procedural default hurdle merely by invoking the phrase "ineffective assistance" or making conclusory allegations about counsel's performance. As the Eleventh Circuit has explained:

> In order to [excuse procedural default], however, the claim of ineffective
> assistance must have merit. [Greene v. United States, 880 F.2d 1299, 1305(11th
> Cir. 1989).] To determine whether it does, we must decide whether the arguments
> the defendant alleges his counsel failed to raise were significant enough to have
> affected the outcome of his appeal. Miller v. Dugger, 858 F.2d 1536, 1538 (11th
> Cir. 1988). Appellate counsel is not ineffective for failing to raise claims

---

Haley, 541 U.S. 386, 388 (2004)). However, the Eleventh Circuit has held that the actual innocence exception to procedural default does not apply to a defendant's claim that he is actually innocent of an armed career criminal sentencing enhancement where that claim is based on legal, as opposed to factual, innocence. Id. at 1198–99. Therefore, this exception cannot provide Williams relief.

[5] Williams does not claim that any other obstacles prevented him from challenging his ACCA status (which, according to Williams increased the maximum sentence he faced) on appeal. Notably, the Supreme Court did not decide Johnson until June 26, 2015, the day after the Court entered judgment on Williams' sentence. However, Johnson was available for Williams to argue on direct appeal. Moreover, while Williams cites Johnson in his pleadings, as discussed below, he was not sentenced under the residual clause. Indeed, in this Section 2255 Motion, Williams challenges whether his burglary conviction qualifies as "generic burglary" under the ACCA's enumerated crimes provision and whether his sale and distribution of cocaine convictions qualify as "serious drug crimes." These arguments are not dependent on Johnson. Thus, the absence of Johnson during his sentencing proceedings and the recency of the decision during his time to file an appeal did not prevent him from challenging his ACCA designation. Furthermore, Williams' direct appeal waiver in his plea agreement did not prevent him from arguing on appeal that this Court sentenced him above the maximum sentence allowed by statute.

> "reasonably considered to be without merit." <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984).

<u>Id.</u>

As discussed below at length, Williams' does not raise a meritorious claim of ineffective assistance of counsel. At the very least, it was reasonable for Mr. East to consider that challenging Williams' status as an armed career criminal would be without merit. Further, Williams has failed to show that any arguments Mr. East supposedly should have made would have affected the outcome of his case. Additionally, while Williams makes conclusory allegations regarding his mental capacity, he fails to establish any link between Mr. East's alleged failure to investigate his mental state and Williams' decision to not appeal his armed career criminal designation.

In short, Williams has failed to demonstrate the "cause and prejudice" necessary to excuse his procedural default. Because he failed to directly appeal his armed career criminal designation, he cannot now claim through a Section 2255 Motion that this Court erred by sentencing him under the ACCA.

## II. Whether Williams Meritoriously Challenges his ACCA Enhancement

Even if Williams had not procedurally defaulted his challenge to his armed career criminal designation, he fails to carry his burden on the merits of this claim. Williams essentially makes three arguments against his ACCA designation: (1) that the Court considered his burglary conviction to be a violent felony under the now-invalidated residual clause; (2) that his conviction under Georgia's former burglary statute cannot form the basis of a "burglary" under the ACCA, because the statute is non-generic and not divisible; and (3) that his crimes for sale of cocaine and possession with intent to distribute cocaine do not constitute "serious drug offenses" under the ACCA. The Court addresses these arguments in turn.

### A.     Whether Williams is Entitled to Relief Under <u>Johnson</u>

Williams contends that Judge Wood relied upon the ACCA's residual clause when finding his burglary to be a predicate offense.  As explained above, the Supreme Court struck down the residual clause in <u>Johnson</u>.  However, to prove a <u>Johnson</u> claim, Williams must show:

> (1) [] the sentencing court relied solely on the residual clause, as opposed to also or solely relying on either the enumerated offenses clause or elements clause (neither of which were called into question by <u>Johnson</u>) to qualify a prior conviction as a violent felony, and (2) [] there were not at least three other prior convictions that could have qualified under either of those two clauses as a violent felony, or as a serious drug offense.

<u>Beeman v. United States</u>, 871 F.3d 1215, 1221–22 (11th Cir. 2017).  Williams cannot meet either of these two requirements.

In the PSI, Probation Officer Riggs stated that Defendant was convicted of burglary under Georgia law on July 19, 1999.  (PSI, ¶ 42.)  The Probation Officer relied upon the <u>Shepard</u> documents to further explain:

> According to the Indictment filed in this case, on June 18, 1999, the defendant unlawfully entered the dwelling of Latasha Jones in Waycross, Georgia, with the intent to commit a felony.  At some point during the burglary, the defendant also struck Jones with his fists and kicked her in the face, causing her to suffer a fractured jaw.  As verified by the sentencing documents, the defendant pled guilty to the offenses as charged in the Indictment and was sentenced as outlined above.

(<u>Id.</u>)  By relying upon the <u>Shepard</u> documents to explain that Williams' conviction met the definition of generic burglary (unlawful entry into a structure, with the intent to commit a crime therein), the Probation Officer clearly conducted an enumerated crimes analysis and not a residual clause analysis.  Williams did not object to this analysis or the underlying facts, even though Judge Wood confirmed he read the PSI and discussed it with Mr. East prior to the sentencing hearing.  (Doc. 57, pp. 2–3.)  Judge Wood adopted Probation Officer Riggs' findings of facts and conclusion during the sentencing hearing.  (<u>Id.</u> at p. 3.)

At no point in the PSI or during the sentencing hearing did Judge Wood, Williams'
counsel, counsel for the Government, or Probation Officer Riggs discuss the residual clause,
quote the residual clause, paraphrase the residual clause, or even indirectly refer to the residual
clause. The sentencing court did not address, much less decide, whether any of Williams'
convictions "otherwise involve conduct that present a serious potential risk of physical injury to
another." The residual clause played no part in Williams' sentencing proceedings whatsoever.

The record establishes that the Court relied upon the ACCA's enumerated crimes clause
and its enumeration of "burglary" as a crime of violence when sentencing Williams. See Oxner
v. United States, No. 16-17036, 2017 WL 6603584, at *2–3 (11th Cir. Dec. 27, 2017) (affirming
district court's finding, based on circumstantial evidence, that the sentencing court relied on the
enumerated crimes provision to enhance defendant's sentence). The Supreme Court in Johnson
emphasized its "decision does not call into question application of the Act to the four enumerated
offenses, or the remainder of the Act's definition of a violent felony." ___ U.S. at ___, 135 S.
Ct. at 2563. Because the record establishes that the residual clause played no part in Williams'
sentencing proceedings, Johnson affords him no relief.

Moreover, even if the record were unclear as to whether Judge Wood relied on the
residual clause or the enumerated crimes clause, the Court still must deny Williams' Motion.
Uncertainty is not enough to obtain Johnson relief. Rather, Williams possesses the burden to
establish that Judge Wood "more likely than not" relied on the residual clause. Beeman, 871
F.3d at 1221–22. Thus, even if the record were silent on that issue, "where the evidence does not
clearly explain what happened, the party with the burden loses." Id. at 1225; see also Oxner,
2017 WL 6603584, at *3 (affirming denial of Johnson relief to Section 2255 movant who
conceded that record was silent as to whether he was sentenced under residual clause or

enumerated crimes clause). Williams has not carried his burden to prove that Judge Wood relied on the residual clause—solely or otherwise—when sentencing him under the ACCA.

Further, even if Williams had proven that Judge Wood solely relied upon the residual clause, he has failed to prove that he does not have at least three convictions for "violent felonies" or "serious drug offenses" under the other clauses of the ACCA. As explained below, prior to his sentencing, Williams had obtained one conviction that qualifies as "burglary" under the ACCA's enumerated crimes clause and two convictions for "serious drug offenses."

### B. Whether Williams' Conviction Constitutes "Burglary" under the ACCA

As laid out above, on July 19, 1999, Williams was convicted of burglary in the Superior Court of Ware County, Georgia. (Doc. 60-2.)[6] At the time of Williams' burglary conviction, Georgia's burglary statute provided that "[a] person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another." O.C.G.A. § 16-7-1 (1999). Williams argues that his conviction under this statute "cannot qualify as a violent felony under

---

[6] Williams was also charged with and convicted of battery in connection with this same incident. He pleaded guilty to unlawfully and intentionally causing physical harm to Latasha Jones by hitting and kicking her in the face and causing her injuries including a fractured jaw. (Doc. 60-2.) The battery statute provided that "[a] person commits the offense of battery when he or she intentionally causes substantial physical harm or visible bodily harm to another." O.C.G.A. § 16-5-23.1 (1999). If this battery conviction were a felony, it would qualify as a "crime of violence" under the ACCA's elements clause. See United States v. Yanes-Cruz, 634 F. App'x 247, 249 (11th Cir. 2015) (holding that defendant's battery conviction under Georgia statute qualifies as a crime of violence under 18 U.S.C. § 16; "Unlike the simple battery statute at issue in [Johnson v. United States, 559 U.S. 133 (2010)], which someone can violate by merely touching another person, the Georgia statute at issue here requires 'substantial physical harm or visible bodily harm.' Such harm simply cannot be caused without the application of physical force—i.e., force capable of causing physical pain or injury to another person.") (citing Hernandez v. United States Attorney Gen., 513 F.3d 1336 (11th Cir. 2008), and United States v. Griffith, 455 F.3d 1339 (11th Cir. 2006)). However, it appears that Williams' conviction was a misdemeanor. See O.C.G.A. § 16-5-23.1(c) ("Except as provided in subsections (d) through (k) of this Code section, a person who commits the offense of battery is guilty of a misdemeanor."). Thus, while Williams' battery conviction "has as an element the use, attempted use, or threatened use of physical force against the person of another," it was not a "violent felony."

the enumerated clause because § 16-7-1(a) is an indivisible, non-generic statute." (Doc. 53, pp. 8–9 (citing <u>James v. United States</u>, 550 U.S. 192 (2007); <u>Mays v. United States</u>, 817 F. 3d 728 (11th Cir. 2016).)

Fatal to Williams' argument is the Eleventh Circuit's decision in <u>Gundy</u>, which post-dates Williams' Motion. As laid out above, in <u>Gundy</u>, the Eleventh Circuit squarely rejected the identical argument that Williams makes here. 842 F.3d at 1166–69. The Court found that, though O.C.G.A. § 16-7-1(a) was "non-generic,"–i.e., broader than generic burglary, it was divisible. <u>Id.</u> Therefore, even after <u>Mathis</u>, courts may continue to apply the modified categorical approach to determine whether a defendant's conviction under O.C.G.A. § 16-7-1(a) matches the generic definition of burglary, and thus, qualifies as a predicate offense under the ACCA. <u>Id.</u> at 1168–69. Following this direction from <u>Gundy</u> and applying the modified categorical approach, I find that Williams' burglary conviction so qualifies.

Because O.C.G.A. § 16-7-1(a) is divisible, the Court "must determine which of the alternative elements in Georgia's burglary statute formed the basis of [Williams'] prior burglary convictions and whether those elements match the generic definition of burglary." <u>Id.</u> at 1168. To make this determination, the Court looks at the <u>Shepard</u> documents, including the charging documents, to determine what of what crime, with what elements, Williams was convicted. <u>Id.</u> The State charged that Williams "unlawfully, without authority, and with the intent to commit a felony, to-wit: theft by taking, therein, entered the dwelling house of another, to-wit: Latasha Jones, located at 1019 Congress Street; Waycross, Georgia." (Doc. 60-2, p. 2.) Williams pleaded guilty to this charge and received a five-year probated sentence. (<u>Id.</u> at p. 4.) Accordingly, the <u>Shepard</u> documents concerning Williams' Georgia burglary conviction make clear that his conviction involved these three elements: (1) an unlawful entry; (2) into a dwelling

house or building; (3) with intent to commit a crime therein. "These elements substantially conform to the generic definition of burglary." Gundy, 842 F.3d at 1169 (citing Howard, 742 F.3d at 1342). Therefore, Williams' conviction qualifies as a "burglary" under the ACCA's enumerated crimes clause. As such, the Court properly counted this conviction as a predicate "violent felony" when sentencing Williams.

   **B.     Whether Williams' Georgia Drug Convictions Constitute "Serious Drug Offenses" under the ACCA**

Williams argues that his prior state controlled substances convictions do not meet the ACCA's definition of "serious drug offense." (Doc. 53, pp. 5–6.) Under the ACCA, "serious drug offense" means "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law[.]" 18 U.S.C. § 924(e)(2)(A)(ii).

On July 15, 1999, Williams pleaded guilty in the Superior Court of Ware County, Georgia, to two counts that he violated Georgia's Controlled Substances Act. (Doc. 60-1.) The first count charged that "on the 1st day of December, 1998, in [Ware County], [Williams] did then and there unlawfully deliver, distribute, and sell a controlled substance, to-wit: cocaine, schedule II, in violation of the Georgia Controlled Substances Act." (Id. at p. 2.) The second count charged that "on the 2nd day of December, 1998, in [Ware County], [Williams] did then and there unlawfully possess, with intent to distribute, a controlled substance, to-wit: cocaine, schedule II, in violation of the Georgia Controlled Substances Act, Contrary to the laws of said State, the good order, peace, and dignity thereof." (Id.) The court sentenced Williams' to concurrent five-year probated sentences as to both counts. (Id. at p. 4.)

At the relevant time, Georgia law provided that "[i]t is unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance." O.C.G.A. § 16-13-30(b) (1999).[7] The punishment for "any person who violates [that subsection] with respect to a controlled substance in Schedule I or Schedule II" was, for a first offense, "not less than five years nor more than 30 years." O.C.G.A. § 16-13-30(d) (1999); see also O.C.G.A § 16-13-26 (list of Schedule II controlled substances); Dennard v. State, 593 S.E.2d 694 (Ga. Ct. App. 2004) (cocaine qualifies as narcotic drug).

In his Motion, Williams contends that Georgia's controlled substances statute has a "three tiered system" where the amount of drugs possessed determines the length of the sentence. (Doc. 53, p. 5 (citing United States v Madera-Madera, 333 F.3d 1228 (11th Cir. 2008).) He appears to argue that, because the documents surrounding his case do not reveal the amount of drugs he possessed, it cannot be said that a maximum term of imprisonment of ten years or more was prescribed by law. (Id. at pp. 5–6.) Williams misconstrues the statute under which he was prosecuted.

The statutory provision under which Williams was convicted carried a maximum penalty of at least ten years or more, regardless of the amount involved. Specifically, for the drug crimes Williams was convicted of (delivering, distributing, and selling cocaine, and possessing cocaine

---

[7] Williams has attached undated copies of O.C.G.A §§ 16-13-30.2 through 16-30-31(g). (Doc. 53, pp. 13–15.) However, these are not the statutes under which he was convicted. Rather, he was charged with and pleaded guilty to unlawfully delivering, distributing, and selling a controlled substance, as well as unlawfully possessing, with intent to distribute, a controlled substance. (Doc. 61, p. 2.) At the time of his conviction, these crimes were outlawed by O.C.G.A. § 16-13-30(b) (1999). Georgia revised its Controlled Substances Act in 2012. However, in this Report, the Court has cited to and assessed Williams' claims under the statutes operative at the time of his state convictions. McNeill v. United States, 563 U.S. 816, 820 (2011) ("The plain text of ACCA requires a federal sentencing court to consult the maximum sentence applicable to a defendant's previous drug offense at the time of his conviction for that offense. The statute requires the court to determine whether a 'previous conviction' was for a serious drug offense. The only way to answer this backward-looking question is to consult the law that applied at the time of that conviction.").

with intent to distribute), O.C.G.A. § 16-13-30(d) mandated a penalty of not less than five years nor more than 30 years. Georgia's drug statutes carried a lower penalty for merely unlawfully purchasing and possessing controlled substances. O.C.G.A. §§ 16-13-30(a), (c). However, Williams' charging documents and plea reveal that he was not convicted under those provisions for those crimes. Rather, his convictions fell under O.C.G.A. § 16-13-30(b), which outlawed the delivery, distribution, and sale of cocaine and the possession of cocaine with intent to distribute. Again, O.C.G.A. § 16-13-30(d) provided a maximum penalty of 30 years' imprisonment for these crimes, regardless of the amount of substance distributed. Thus, the state crimes that Williams was convicted of and the statutory provision under which he was convicted carried the requisite punishment for his convictions to qualify as "serious drug offenses" under the ACCA.

Williams' reliance on Madera-Madera misses the mark. In that case, the Eleventh Circuit discussed whether the defendant's prior felony drug conviction under Georgia law constitutes a "drug trafficking offense" under Section 2L1.2(b)(1)(A)(i) of the Sentencing Guidelines. 333 F.3d at 1228. In concluding that the conviction did so qualify, the Court explained that the Georgia legislature enacted "a three-tiered scheme for punishing those persons involved with drugs." Id. at 1231. The Court explained that those tiers are: "(1) possession of *any amount* of a controlled substance under O.C.G.A. § 16-13-30(a); (2) manufacture, delivery, distribution, dispensing, administering, selling, or possession with intent to distribute *any amount* of a controlled substance under O.C.G.A. § 16-13-30(b); and (3) 'trafficking' by possessing more than a *designated amount* of a controlled substance under O.C.G.A. § 16-13-31 which 'aims at a *yet more serious offense*.'" Id. (italics in original) (citing Bassett v. Lemacks, 370 S.E.2d 146 (Ga. 1988)). Thus, Madera-Madera confirms that, while the amount of drugs is pertinent to assessing whether a conviction constitutes "drug trafficking" under Georgia law, a defendant can

be convicted under O.C.G.A. § 16-13-30(b) of distributing, delivering, selling, or possessing with intent to distribute "*any amount* of a controlled substance." In other words, while the amount of drugs is pertinent to whether a defendant reaches the third tier (trafficking), it is not pertinent as to whether he reaches the second tier (distribution). Williams need only have been convicted of the second tier (distribution), which he clearly was, for his conviction to satisfy the definition of "serious drug offense" under the ACCA. Moreover, the definition of a "serious drug offense" under the ACCA does not hinge on the amount of drugs involved but rather the applicable statutory penalty. Again, the statutory penalty for violating O.C.G.A. § 16-13-30(b) was the same regardless of the amount of drugs involved. O.C.G.A. § 16-13-30(d). Therefore, Williams' Shepard documents need not detail the amount of drugs involved to determine that he was twice convicted of an offense "under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law[.]" 18 U.S.C. § 924(e)(2)(A)(ii).

In his Reply, Williams argues that "[i]t is more than settled that Georgia's drug statute sweeps more broadly than ACCA definition of 'serious drug offenses' and as such encompasses acts which constitutes both serious and non-serious drug offenses." (Doc. 61, p. 4.) While Williams argues this premise is "more than settled," he has not cited any precedent supporting his position. To the contrary, the Eleventh Circuit and this Court have repeatedly found felony convictions under Georgia's drug statutes to qualify as "serious drug offenses" under the ACCA. See, e.g., Gatson v. United States, No. 16-14940-C, 2017 WL 3224851, at *1 (11th Cir. Feb. 1, 2017); United States v. Dixon, 598 F. App'x 704, 706 (11th Cir. 2015); United States v. Wilcher, 512 F. App'x 919 (11th Cir. 2013); Bennett v. United States, No. 2:12-CR-5, 2017 WL 3706338,

at *4 (S.D. Ga. Aug. 28, 2017), *report and recommendation adopted*, No. 2:12-CR-5, 2017 WL 4782659 (S.D. Ga. Oct. 23, 2017); McKinney v. United States, No. CR 112-203, 2017 WL 1684537, at *5 (S.D. Ga. Mar. 20, 2017), *report and recommendation adopted*, No. CR 112-203, 2017 WL 1682540 (S.D. Ga. May 1, 2017); James v. United States, No. CR405-263, 2017 WL 1044701, at *2 (S.D. Ga. Jan. 19, 2017), *report and recommendation adopted*, No. CR405-263, 2017 WL 1044688 (S.D. Ga. Mar. 17, 2017).

To be sure, O.C.G.A. § 16-13-30(b), the statute Williams was convicted under, included "deliver . . . dispense, administer, and sell", in addition to "distribute" and "manufacture", in its list of prohibited activities. However, these additional activities are forms of distributing. Therefore, their inclusion did not stretch the elements of the statute beyond the ACCA's definition of a serious drug offense. See United States v. Johnson, 570 F. App'x 852, 857 (11th Cir. 2014) (defendant's convictions for sale of cocaine fit the ACCA definition of "serious drug offense" because "selling is a form of distributing"); Green v. United States, No. CR407-042, 2017 WL 1100443, at *2 (S.D. Ga. Jan. 9, 2017), *report and recommendation adopted*, No. CR407-042, 2017 WL 1074938 (S.D. Ga. Mar. 20, 2017) (defendant's 1998 conviction under O.C.G.A. § 16-13-30 fits § 924(e) definition because "selling is a form of distributing"); United States v. Rushin, No. CR 3:16-00140-01, 2017 WL 3401296, at *3 (S.D. W. Va. Aug. 8, 2017) (Ohio statute "fits harmoniously with the generic offense requirement that a defendant possess a drug with an intent to distribute, as selling is another form of distribution."); King v. United States, No. 4:11-CR-00020-LSC, 2014 WL 5426773, at *3 (N.D. Ala. Oct. 24, 2014) ("Obviously, selling, furnishing and giving away are all forms of distributing.")

Further, even if the elements of former O.C.G.A. § 16-13-30(b) swept more broadly than the definition of "serious drug offense," the statute set out the elements of the offense in the

alternative. Therefore, the Court may turn to the Shepard documents to determine which alternative formed the basis of the Williams' prior conviction. Here, those documents establish that Williams was found guilty under elements that match the ACCA's definition of serious drug offense. As to Williams' first drug conviction, the charging and plea documents reveal that he was convicted of "deliver[ing], distribut[ing], and sell[ing] a controlled substance, to-wit: cocaine" on December 1, 1998. (Doc. 60-1.) As to his second offense, Williams was convicted of "possess[ing], with intent to distribute, a controlled substance, to-wit: cocaine" on December 2, 1998. The elements of both of these convictions fit the ACCA because: (1) they were state law crimes; (2) they involved distributing cocaine or possessing with intent to distribute cocaine; (3) cocaine is a controlled substance; and (4) they were punishable by a maximum term of imprisonment of ten years or more.

To the extent that Williams argues that his first conviction does not meet the ACCA definition because he was only convicted of "sale of cocaine", the Court must reject that argument. First, as laid out above, the Shepard documents reveal he was charged with and pleaded guilty to delivering, distributing, and selling cocaine. (Doc. 60-1, p. 2.) Moreover, it is more than settled that "selling is a form of distributing," and a conviction for sale of a controlled substance can qualify as a "serious drug offense" under the ACCA. Johnson, 570 F. App'x at 857; see also Reeves v. United States, No. 16-17333-B, 2017 WL 5997388, at *2 (11th Cir. Mar. 13, 2017); United States v. Darling, 619 F. App'x 877, 880 (11th Cir. 2015) (defendant's convictions for sale of cocaine qualified as "serious drug offenses).

For all of these reasons, Williams' July 1999 Georgia convictions for dispensing, distributing, and selling cocaine and possessing cocaine with the intent to distribute constitute

"serious drug offenses" under the ACCA and properly support his armed career criminal designation.

## III.    Williams' Claims of Ineffective Assistance of Counsel

Williams claims Mr. East's performance was deficient in two respects: (1) he did not challenge the Court's designation of Williams as an armed career criminal; and (2) he did not investigate and pursue an insanity defense in light of Williams' mental disorders.

Criminal defendants have a right to effective assistance of counsel at all critical stages of the proceedings.  Strickland v. Washington, 466 U.S. 668 (1984).  This right extends to the entry of a guilty plea, Hill v. Lockhart, 474 U.S. 52, 58 (1985), and during sentencing proceedings, Glover v. United States, 531 U.S. 198, 202 (2001).  Initially, it should be noted that a defendant's guilty plea, appeal waiver, or collateral attack waiver does not preclude an ineffective assistance of counsel claim premised on an involuntary and unintelligent plea.  United States v. Puentes-Hurtado, 794 F.3d 1278, 1281, 1285 (11th Cir. 2005).

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate (1) his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result of that deficient performance.  Strickland, 466 U.S. at 685–86.  "If a petitioner cannot satisfy one prong, we need not review the other prong."  Duhart v. United States, 556 F. App'x 897, 898 (11th Cir. 2014).  Thus, if a defendant cannot show prejudice, the Court need not determine whether defendant's allegations show his counsel's performance fell below an objective standard of reasonableness.

The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases."  Hill, 474 U.S. at 56.  There is a strong presumption that counsel's conduct fell within the range of reasonable professional

assistance. <u>Davis v. United States</u>, 404 F. App'x 336, 337 (11th Cir. 2010) (citing <u>Strickland</u>, 466 U.S. at 686). "It is petitioner's burden to 'establish that counsel preformed outside the wide range of reasonable professional assistance' by making 'errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment.'" <u>LeCroy v. United States</u>, 739 F.3d 1297, 1312 (11th Cir. 2014) (quoting <u>Butcher v. United States</u>, 368 F.3d 1290, 1293 (11th Cir. 2004) (second alteration in original)). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Strickland</u>, 466 U.S. at 690. Further, retrospective judicial scrutiny of counsel's performance "must be highly deferential" and must "eliminate the distorting effects of hindsight." <u>Id.</u> at 689. "In evaluating performance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" <u>LeCroy</u>, 739 F.3d at 1312 (quoting <u>Strickland</u>, 466 U.S. at 690).

"Showing prejudice requires petitioner to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> (internal citation omitted). "The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his attorney prejudiced the defense." <u>Id.</u> at 1312–13. "The likelihood of a different result must be substantial, not just conceivable." <u>Harrington v. Richter</u>, 562 U.S. 86, 112 (2011). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

A movant is not entitled to habeas relief "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991). "The allegations must be

factual and specific, not conclusory.  Conclusory allegations are simply not enough to warrant a hearing." Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (citing San Martin v. McNeil, 633 F.3d 1257, 1271 (11th Cir. 2011)).  For a movant proceeding *pro se*, the court will liberally construe the pleading, but he or she "must suggest (even if inartfully) that there is at least some factual support for a claim; it is not enough just to invoke a legal theory devoid of any factual basis." Jones v. Fla. Parole Comm'n, 787 F.3d 1105, 1107 (11th Cir. 2015).  "An evidentiary hearing may be necessary where the material facts are in dispute, but a [movant] is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics." Pugh v. Smith, 465 F.3d 1295, 1300 (11th Cir. 2006) (citations omitted).  Stated another way, "if a habeas petition does not allege enough specific facts, that if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." Chavez, 647 F.3d at 1060 (citing Allen v. Sec'y Fla. Dep't of Corr., 611 F.3d 740, 763 (11th Cir. 2010).  Further, because solemn representations at a plea hearing by a defendant, his attorney, and the prosecutor "carry a strong presumption of verity" and "constitute a formidable barrier in subsequent collateral proceedings," a movant's later "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." Blackledge v. Allison, 431 U.S. 63, 73–74 (1977) (citing Machibroda v. United States, 368 U.S. 487, 495–96 (1962), and Price v. Johnston, 334 U.S. 266, 286–87 (1948)).

Here, Williams relies upon wholly conclusory allegations as support for his claims that Mr. East rendered ineffective assistance.  He fails to make factual and specific allegations and largely invokes legal theories without connecting those theories to the actual facts of his case. The Court need not hold an evidentiary hearing to resolve Williams' claims.  Indeed, the Court could dispose of his claims without in-depth analysis due to Williams' conclusory pleadings.

However, the analysis below demonstrates that, even construing Williams' pleadings liberally, he is not entitled to relief.

### A.    Mr. East's Decision not to Challenge Williams' ACCA Status

As laid out in detail above, Williams' prior state convictions for burglary, dispensing, distributing and selling cocaine, and possessing cocaine with intent to distribute were and remain proper predicate offenses under the ACCA.  Mr. East had no obligation to advance an argument that had no legal merit.  <u>Diaz-Boyzo v. United States</u>, 294 F. App'x 558, 560 (11th Cir. 2008) (counsel not ineffective for failing to pursue a non-meritorious issue.)  At the very least, it was by no means clear that Williams' ACCA designation was questionable.  Thus, it was not objectively unreasonable for Mr. East to decide not challenge Williams' ACCA designation and instead focus on obtaining a sentence at the statutory minimum and below the Guidelines' range. This is the sentence Williams requested at the sentencing hearing, and he and Mr. East were successful in this strategy.  Mr. East's advice on this issue was within the range of competence demanded of attorneys in criminal cases.

This is particularly true given the fact the record is clear that Mr. East advised Williams of his ACCA status and the fact that he would be sentenced to at least fifteen years' imprisonment as an armed career criminal.  Indeed, the Court terminated the first Rule 11 hearing because Williams stated he did not fully understand the penalties against him.  Then, at the final Rule 11 hearing and prior to entering a guilty plea, Williams repeatedly assured the Court that he understood the fifteen-year mandatory minimum penalty that he would face and that he had discussed the penalty at length with Mr. East.  (Doc. 56, pp. 6–7, 9–11, 13.)  He also indicated that he was satisfied with Mr. East's performance, that Mr. East had answered any questions that he may have had, and that he had no complaints about Mr. East whatsoever.  (<u>Id.</u>

at pp. 9–11.)  Again, at his sentencing hearing, Williams asked Judge Wood to sentence him to fifteen years' imprisonment, which is the very sentence that the Court imposed in the case. (Doc. 57, p. 5.)

Williams must live with what he has told this Court under oath.  In the context of a plea hearing, the Supreme Court has stated that "the representations of the defendant . . . at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity."  Blackledge, 431 U.S. at 73–74.  The defendant's representations are presumptively trustworthy and are considered conclusive absent compelling evidence showing otherwise.  Id.  Given his sworn testimony, Williams cannot now be heard to argue that Mr. East should have pursued a doomed challenge to Williams' ACCA status.

Furthermore, even if Williams can show that Mr. East's performance was deficient as to the ACCA challenge, he cannot show any prejudice from that deficiency.  Again, as laid out above, Williams possessed at least three qualifying predicate convictions under the ACCA. Thus, Williams has failed to demonstrate a reasonable probability that the outcome of his case would have been different if Mr. East had challenged his ACCA designation.

**B.      Mr. East's Decision not to Purse an Insanity Defense**

Williams also claims that Mr. East rendered ineffective assistance by failing to investigate and assert an insanity defense.[8]  Williams claims that Mr. East should have had him

---

[8]  It does not appear that Williams contends that Mr. East should have investigated whether he was competent to stand trial.  However, even if he had raised such a claim, the Court should reject that claim. Williams waived such a claim through his knowing and voluntary guilty plea and his sworn statements to the Court.  Moreover, Williams has not presented any evidence that he was unable to understand the proceedings against him or that he was unable to assist in his defense.  In fact, the record in this case, including Williams' sworn testimony at the Rule 11 and sentencing hearings, indicates just the opposite. Pertinently, William testified that he was taking medication for his mental disorders and that those medications were effective.  Thus, it cannot be said that Mr. East's decision not to have Williams'

undergo a psychological evaluation given Williams' history of "paranoid schizophrenia, bi-polar disorder, and long term chemical dependency." (Doc. 53, p. 11.)

As an initial matter, Williams' "knowing and voluntary guilty plea waive[d] all non-jurisdictional, pre-plea defects, including ineffective assistance of counsel with respect to issues not implicating the voluntariness of the plea." <u>Wilson v. United States</u>, 962 F.2d 996, 997 (11th Cir. 1992). As detailed above, during the Rule 11 hearing, Judge Wood took careful measure to make certain that Williams' plea was knowingly, voluntarily, and intelligently made. (Doc. 56.) Williams stated that no one was forcing him to plead guilty. Given Williams' mental health conditions, Judge Wood paid "particular attention" to his interaction with the Court prior to accepting his guilty plea. (<u>Id.</u> at pp. 19–21.) Judge Wood asked him about his conditions, and Williams testified that his medications adequately addressed his conditions. (<u>Id.</u> at pp. 5–6.) Throughout the plea hearing, Williams was able to converse with the Court, recount personal information, and, among other things, describe in his own words why his first plea hearing had been discontinued and why he was then pleading guilty. (<u>Id.</u> at pp. 5–8.) Moreover, Mr. East represented that he had known Mr. Williams since 1999, had represented him previously and knew of no reason that Williams would be able to "meet the criteria of some type of psychological defense." (<u>Id.</u> at p. 6.) Williams did not object to this characterization and stated that he had no difficulty discussing his case with his attorney. (<u>Id.</u>) Having carefully observed and questioned Williams at length, Judge Wood found that Williams was not "in any way

competency evaluated was below the standard of reasonableness expected of an attorney. Moreover, "[i]n order to demonstrate prejudice from his lawyer's failure to have him evaluated, [Williams] has to show that there was at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial." <u>Alexander v. Dugger</u>, 841 F.2d 371, 375 (11th Cir. 1988) (citing <u>Adams v. Wainwright</u>, 764 F.2d 1356, 1367 (11th Cir. 1985)). Williams has not presented any evidence, much less a reasonable probability, that a psychological evaluation would have found him incompetent. Indeed, the record points to just the opposite. Thus, Williams has not demonstrated ineffectiveness or prejudice on a putative claim that Mr. East should have had his competency evaluated.

laboring under any mental disability or defect that interferes with his ability to converse with his attorney and plan and strategize his own defense" and that he fully appreciated the decision he was making by pleading guilty and the consequences of doing so.  (<u>Id.</u> at p. 20–21.)  Williams testified under oath that he agreed with this assessment.  (<u>Id.</u> at p. 21.)

At no point during his plea hearing did Williams indicate in any way that he did not understand the proceedings and the decision he was making.  At no point did he indicate that he did not understand the wrongfulness of his actions.  To the contrary, he stated that he wanted to plead guilty to Counts One and Three because he was indeed guilty of those crimes.  (<u>Id.</u> at p. 19.)  Williams also specifically testified that he and Mr. East had multiple conversations about his case, that he was satisfied with Mr. East's services, and that he had no complaints about Mr. East whatsoever.  (<u>Id.</u> at p. 11.)  Given this extensive colloquy and Williams' sworn declarations, Williams cannot know be heard to argue that his plea was not knowingly and voluntarily made. <u>Blackledge</u>, 431 U.S. at 73–74.  As such, he has waived his argument that Mr. East should have pursued an insanity defense.

Even if Williams' knowing and voluntary plea did not waive this claim, he has failed to demonstrate: (1) that Mr. East's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; or (2) that Williams suffered prejudice as a result of that deficient performance.  <u>Strickland</u>, 466 U.S. at 685–86.

In order to mount a successful insanity defense, Williams would have had to show that, at the time of the offense, he was unable to appreciate the nature and quality or the wrongfulness of his acts as a result of a severe mental disease or defect.  18 U.S.C. § 17(a).  A mental disease or defect alone is not enough to establish an insanity defense.  <u>Id.</u>  Moreover, Williams would have borne the burden of proving an insanity defense by clear and convincing evidence.  18 U.S.C.

§ 17(b). As the Eleventh Circuit has explained, a Section 2255 movant's "bare and unsubstantiated assertions that a reasonable probability existed that a jury would have found him insane had trial counsel conducted an investigation [are] insufficient to support his motion to vacate." Collins v. United States, 481 F. App'x 525, 529 (11th Cir. 2012). Further, an attorney's decision to not pursue an insanity defense cannot be said to be ineffective where the only evidence of a defendant's mental instability was "sufficiently equivocal that reasonable counsel would not have been under a duty to secure a psychiatric examination." Bertolotti v. Bugger, 883 F.2d 1503, 1514 (11th Cir. 1989). Moreover, the mere existence of a mental disease or defect does not create a *per se* rule that counsel should have the defendant's sanity evaluated. See Onate-Sosa v. United States, No. 08-20164-CR, 2011 WL 1878211, at *13 (S.D. Fla. Jan. 13, 2011), *report and recommendation adopted*, No. 09-21555-CIV, 2011 WL 1883167 (S.D. Fla. May 17, 2011) (rejecting claim of ineffective assistance of counsel claim based on failure to have mental health evaluation of competency both at the time of the offense and prior to the change of plea proceeding, where defendant had bipolar disorder and schizophrenia because mental disease alone is not enough to establish incompetence or insanity, and it appeared from record, including change of plea and sentencing proceedings, that defendant was sane and competent and nothing in the record establishes otherwise).

Williams has failed to establish that Mr. East's decision to not investigate or pursue an insanity defense fell outside of the wide range of professionally competent assistance. Other than bare allegations, Williams has not pointed to any evidence from which Mr. East should have reasonably questioned that Williams was unable to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. § 17(a). Williams offers no evidence that he ever relayed to Mr. East that he did not appreciate the nature and quality or the wrongfulness of his acts. He

apparently never asked Mr. East to investigate an insanity defense. Moreover, the record of Williams' mental disease is sufficiently equivocal that Mr. East was not under a duty to secure a psychiatric examination.

While Williams suffers from a severe mental disease or defect, that alone is not sufficient to warrant an insanity defense. Further, the record reveals that Williams has been on medication since 2009 and that those medications control his conditions. (PSI, ¶ 76 ("[Williams] advised that he was prescribed Risperdal and Depakote in approximately 2009 and has been taking that medication since that time."). Williams presented the following sworn testimony regarding his mental condition at his Rule 11 hearing:

> THE COURT: And any disabilities of which you're aware?
>
> THE DEFENDANT: Bipolar, paranoid schizophrenic.
>
> THE COURT: And you take what medication for those?
>
> THE DEFENDANT: Depakote and Risperdal.
>
> THE COURT: And are you current on your medication?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: And being current on your medication, does it adequately address those conditions?
>
> THE DEFENDANT: Yes, ma'am.

(Doc. 56, pp. 5–6.) In light of these statements and Judge Wood's careful observation of Williams at the first and second Rule 11 hearings, Judge Wood was confident that Williams was able to appreciate the nature of the proceedings despite his stated mental diseases. (Id. at p. 21.)

It was reasonable for Mr. East to reach the same conclusion. Mr. East stated that he had known Williams since 1999, that he had represented him previously, and that no court in Williams' extensive criminal history had found Williams' incompetent to stand trial. (Id. at

pp. 6, 21.)  Mr. East told the Court that did not believe that Williams would be "able to meet the criteria of some type of psychological defense".  (Id.)

The facts surrounding Williams' crimes further confirm that he was able to appreciate the nature, quality, and wrongfulness of his acts.  Prior to the search of Williams' home, an investigation revealed that Williams was conducting drug transactions, specifically selling methamphetamine out of his home.  (PSI, ¶¶ 4–5.)  Before this time, Williams had garnered a litany of prior criminal convictions, including for firearm and drug-related crimes.  (Id. at ¶¶ 38–58.)  Upon the search of Williams' home, officers found him lying in the bed surrounded by firearms, drugs, and tools of the drug trade.  (Id. at ¶ 7.)  In Williams' interview with officers following the search, he did not express any confusion about his crimes.  Rather, he admitted that he sold methamphetamine to support his drug habit.  (Id. at ¶ 9.)  He also admitted that he purchased one of the firearms years ago and the other firearm a month earlier.  (Id.)  He was able to recall specifics regarding his purchase of the firearms and his use of them.  He stated that he possessed the firearms for the purpose of protection.  (Id.)  These facts were not only established by the PSI, to which Williams did not object, but also by Sergeant Ray's testimony at the sentencing hearing.  (Doc. 56, pp. 22–24.)

If this overwhelming evidence were not enough to establish that Williams appreciated the wrongfulness of his acts, his testimony before this Court solidifies that appreciation.  At his Rule 11 hearing, he repeatedly admitted under oath to the wrongfulness of his conduct.  At the conclusion of Sergeant Ray's testimony, Judge Wood asked Williams if he "dispute[s] any of the testimony given by Sergeant Ray in your case?"  (Id. at pp. 24–25.)  Williams responded that he did not.  (Id. at p. 25 ("No, ma'am.").)  Additionally, at his sentencing hearing, he testified that he had been selling drugs to support his drug habit and that he possessed the firearms for

protection from burglars, as there had been a number of burglaries in his area. (Doc. 57, p. 4.) Williams apologized for his crimes, and he asked the Court "to have leniency" on him. (Id. at p. 6.) These sworn statements of intent, purpose, and remorse thwart any claims that he was not able to appreciate the wrongfulness of his conduct.

"Establishing insanity is a high bar." Sullivan v. Jones, No. 4:12CV250/RV/CAS, 2015 WL 4756190, at *27 (N.D. Fla. Aug. 11, 2015), aff'd sub nom., Sullivan v. Sec'y, Fla. Dep't of Corr., 837 F.3d 1195 (11th Cir. 2016). Given all of facts of this case, it was reasonable for Mr. East to conclude that Williams could not clear that bar. It was reasonable to not pursue a strategy centered on Williams' alleged inability to appreciate the nature, quality, and wrongfulness of his acts. See United States v. Black, 739 F.3d 931, 933 (6th Cir. 2014) (defendant not entitled to insanity defense in prosecution for being felon in possession of firearm given evidence of his capacity to understand the wrongfulness of his actions).

Furthermore, even if Williams had established that Mr. East rendered ineffective assistance by failing to investigate and pursue an insanity defense, Williams has failed to demonstrate that he suffered prejudice from that failure. Rather, as laid out above, the record reveals that he had the ability to appreciate the nature, quality, and wrongfulness of his acts. Id. ("Even if these rulings prejudiced [defendant's] effort to establish that he suffered from a severe mental disease or defect, any error was harmless because the evidence overwhelmingly establishes that he had the capacity to appreciate the wrongfulness of his acts.") Further, Williams has not presented any evidence, much less a reasonable probability, that a psychological evaluation would have found him legally insane.[9] Williams has provided medical

---

[9] Williams does not argue that Mr. East should have investigated his diminished capacity as opposed to a defense of insanity. Furthermore, even if Williams could show that an evaluation of his mental status would have revealed diminished capacity, that evidence would not have been admissible as to his general intent crime of possessing a firearm as a convicted felon and likely would have been excluded as to his

records from the Bureau of Prisons.  (Doc. 53, pp. 18–22.)  While those documents record his stated mental health issues, they do not indicate that those issues render him insane or incompetent.  Rather, these records state that Williams "has been relatively stable on his current medication for the past several years."  (Id. at p. 19.)  Further, the psychologist evaluating Williams observed:

> There are no indications of delusional mood or ideas, and no first rank symptoms present.  He is oriented by person, place, time, and purpose for the interview.  His concentration and attention appear to be within normal limits.  His cognitive functioning appears to be at an average range. Insight and judgment appear to be appropriate based on his verbalizations and recognition of need for services.

(Id.)  The psychologist further opined that Williams "shows no significant level of functional impairment associated with a mental illness."  (Id. at p. 20.)  This evidence offered by Williams contradicts any argument that a mental health evaluation would have found him legally insane or incompetent.

Though Williams now wants to shirk responsibility for the wrongfulness of his crimes, it appears he possessed the ability to appreciate that wrongfulness.  With Williams having failed to establish that Mr. East's level of assistance fell below the standard of reasonableness or that any deficiencies in Mr. East's performance prejudiced his defense, the Court should reject his claims of ineffective assistance of counsel.

---

specific intent crime of possession of methamphetamine with intent to distribute.  See United States v. Cameron, 907 F.2d 1051, 1067–68 (11th Cir. 1990) (excluding evidence regarding defendant's schizophrenia offered to show diminished capacity in prosecution for possession with intent to distribute); United States v. Peralta, 930 F. Supp. 1523, 1530 (S.D. Fla. 1996) (excluding evidence of diminished capacity in prosecution for general intent crimes "the Eleventh Circuit follows the universal rule that diminished capacity evidence is relevant only in the context of a specific intent crime, where the Defendant's formulation of an unlawful or malevolent purpose must be established by the Government") (citing United States v. Westcott, 83 F.3d 1354, 1357 (11th Cir. 1996); Cameron, 907 F.2d at 1067–68).  Moreover, Williams cannot show prejudice from any such failure, as the record reveals that he had the capacity to form the intent necessary for these crimes.  Williams has failed to offer anything other than conclusory allegations to the contrary.

### III. Leave to Appeal *in Forma Pauperis* and Certificate of Appealability

The Court should also deny Williams leave to appeal *in forma pauperis* and a Certificate of Appealability. Though Williams has, of course, not yet filed a notice of appeal, it is proper to address these issues in the Court's order of dismissal. Pursuant to Rule 11 of the Rules Governing Section 2255 Cases, "the district court <u>must</u> issue or deny a certificate of appealability when it issues a final order adverse to the applicant." (Emphasis supplied); <u>see also</u> Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3). Good faith in this context must be judged by an objective standard. <u>Busch v. Cty. of Volusia</u>, 189 F.R.D. 687, 691 (M.D. Fla. 1999). A party does not proceed in good faith when he seeks to advance a frivolous claim or argument. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962). A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless. <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989); <u>Carroll v. Gross</u>, 984 F.2d 392, 393 (11th Cir. 1993). Stated another way, an *in forma pauperis* action is frivolous, and thus, not brought in good faith, if it is "without arguable merit either in law or fact." <u>Napier v. Preslicka</u>, 314 F.3d 528, 531 (11th Cir. 2002); <u>see also</u> <u>Brown v. United States</u>, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Additionally, under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued. A certificate of appealability may issue only if the applicant makes a substantial showing of a denial of a constitutional right. The decision to issue a certificate of appealability requires "an overview of

the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). In order to obtain a certificate of appealability, a petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Id. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir. 2000). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Miller-El, 537 U.S. at 336.

Based on the above analysis of Williams' pleadings and the Government's Response and applying the Certificate of Appealability standards set forth above, there are no discernable issues worthy of a certificate of appeal; therefore, the Court should **DENY** the issuance of a Certificate of Appealability. If the Court adopts this recommendation and denies Williams a Certificate of Appealability, Williams is advised that he "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rule 11(a), Rules Governing Section 2255 Cases in the United States District Courts. Furthermore, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, the Court should likewise **DENY** Williams *in forma pauperis* status on appeal.

## CONCLUSION

For the above-stated reasons, I **RECOMMEND** this Court **DENY** Williams' Motion to Vacate, Set Aside, or Correct his Sentence. (Doc. 52.) Further, I **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of

dismissal.  Additionally, the Court should **DENY** Williams a Certificate of Appealability and *in forma pauperis* status on appeal.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered.  Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included.  Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge.  See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985).  A copy of the objections must be served upon all other parties to the action.  The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon Williams and Respondent.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 7th day of February, 2018.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA